Filed 4/16/26  In re Thomas J. CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re Thomas J., a Person Coming Under the Juvenile Court Law. | |
| NAPA COUNTY HEALTH AND HUMAN SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> Amber M., <br><br> Defendant and Appellant. | A174080 <br><br> (Napa County Super. Ct. No. 25JD000004) |

In this dependency action, Amber M. (mother) appeals from the juvenile court's orders asserting jurisdiction over her son Thomas J., removing him from mother's custody, placing him with David M. (father) and making father the legal and physical custodian, and terminating jurisdiction without further supervision of the placement.  First, she challenges the sufficiency of the evidence to support jurisdiction.  Next, she contends that the juvenile court erred by failing to make a removal decision before placing Thomas with father and by failing to state facts in support of its removal decision; she also challenges the sufficiency of the evidence to support removal.  She argues that we should reverse the court's placement order because the court erred in declining to find that placement with father would

1

be detrimental to Thomas.  Lastly, she argues the juvenile court abused its discretion by terminating jurisdiction instead of providing for supervision of the placement with father.  We agree only that the juvenile court erred by failing to state the facts upon which it based its removal decision, but we conclude that the error was harmless.  We therefore affirm.

## BACKGROUND

In January 2025, Napa County Health and Human Services (Department) received a report that mother had tested positive four times in December for methamphetamine, cocaine, and fentanyl, and that two drug screens in January had come up presumptively positive for fentanyl.  The reporting party was concerned for the safety and well-being of Thomas, who was two years old and in mother's custody.  The Department opened the investigation that resulted in the juvenile court orders from which mother appeals.

## I.

## Pre-Referral

## A.

In 2015, mother was convicted of cruelty to a child with possible injury or death and, later, a drug-related DUI.  Mother was sentenced to several months of jail time and received five years of probation.  The child was Thomas's two-year-old half sibling, who was removed from mother's custody because of exposure to heroin and drug paraphernalia and because of mother's absence following her arrest.  Mother received family reunification services for more than a year, but by April 2016 she had failed to reunify.  Mother's parental rights to half sibling were terminated in July 2016.  Father also had a criminal record relating to substance use, consisting of three DUI convictions in 2007, 2009, and 2015, for which he was successively sentenced for increasing jail time and five years of probation.

2

Mother and father met in recovery, and they had two children together: Thomas's older brother, born in 2017, and Thomas, born five years later in 2022. During older brother's early years, mother and father were married and lived together. According to father, he would come home from work during lunch to find mother sleeping while older brother roamed unattended and unfed with a full diaper. Father believed that mother was using drugs.

In 2021, when older brother was about four years old, father was convicted of being under the influence of a controlled substance and was found to have violated probation relating to his 2015 DUI conviction. He was sentenced to one day in jail and one year of probation. Later that year, mother violated probation for her cruelty to a child and DUI convictions, receiving more jail time and an extension of her probation. Two months later, she violated probation again, receiving 110 days in jail and a further extension of her probation. According to father, in 2022, mother and others smoked methamphetamine in the home with older brother present and while mother was pregnant with Thomas.

From late March 2022 until father filed for divorce in July, father and mother filed requests for domestic violence restraining orders against each other and the Department fielded several referrals alleging neglect of older brother, alternately by mother or father. None of the referrals triggered an investigation. According to mother, she left father because of domestic violence while she was pregnant with Thomas.

Father had a probation violation in June 2022 for alcohol use and another probation violation in August. In September 2022, father filed for emergency legal and physical custody of older brother in family court. In early October, the family court granted the petition. From that point, the

Department received no referrals regarding father, and father had no probation violations or arrests.

**B.**

In October 2022, while pregnant with Thomas, mother was convicted of being under the influence of a controlled substance. She was sentenced to 104 days in jail, but it appears that she was allowed to enter residential substance-abuse treatment instead. She gave birth to Thomas there in November. Father was not present.

In February 2023, mother and Thomas moved out of residential treatment. They moved in with mother's boyfriend at that time, Bryan H., who lived with his parents. Mother described the parents as drug users. She and Bryan H. later moved to his grandmother's house.

About a month later, the family court granted father temporary sole legal and physical custody of older brother. The court ordered professionally supervised visits to mother every other week for two hours. By July, mother had failed to attend six consecutive visits, and thus she did not qualify for a step up in frequency or duration. In 2024, though she was scheduled for visits every other week, she attended only four times. According to father, he encouraged mother to visit so that older brother could have a consistent relationship with her. According to mother, father fought her about the visits, and for that reason they did not happen as they should have.

Older brother thrived in father's custody. He has autism and an auditory processing disorder, but he was verbal and social, and the school district provided him with services. He played little league baseball, and father coached the team and took him to his games.

Father initially did not believe that he was the biological father of Thomas until a paternity test that he requested confirmed it. After the test,

4

according to father, he did not seek visitation with Thomas through family court because he did not want to create an attachment that mother would use as leverage against him. Mother and father informally agreed that she would keep Thomas and he would keep older brother, and neither would seek child support from the other.

In spring 2023, when Thomas was about five or six months old, mother became friends with her pastor and his wife, Mr. and Mrs. C. She left Thomas with the C. family for a few weeks, and thereafter Thomas became integrated with their family, participating in their trips and activities and spending weeks at a time with them. According to Mrs. C., the C. family provided the majority of Thomas's care and stability. Mrs. C. said that mother would ask for Thomas to stay one night, and then she would come to get him two weeks later.

In October 2024, mother showed up at the C. family's house with bruises that she attributed to Bryan H., and Mrs. C. said that on Halloween Bryan H. appeared high. After Mrs. C. advised mother to leave Bryan H., the C. family did not see mother or Thomas very often. Mother later told Mrs. C. she had cut off contact because of Mrs. C.'s opinion about Bryan H.

When mother stopped taking Thomas to the C.'s, she said she started taking him to maternal grandmother's. Maternal grandmother said that she watched Thomas three to four days a week for two to four hours a day and sometimes overnight. She would usually have him for the weekend and then see him in the day during the week. Sometimes during the week she would pick him up at 10 a.m. and have him until 8 p.m.

## C.

From October 2024 through January 10, 2025, mother tested positive multiple times for various drugs, including fentanyl and methamphetamine.[1]

The tests were not the only evidence of mother's drug use during this period. In October, mother told her psychiatrist that she was using methamphetamine, and so he stopped prescribing her Ritalin, another stimulant. Bryan H. said he saw mother using methamphetamine, fentanyl, and alcohol. He said that "normally" mother would drop Thomas off with the C. family or with maternal grandmother before using drugs, but he also saw her using drugs "a couple of times" around Thomas. Mother later told her friend Jennifer R. that she had been struggling and relapsing with both methamphetamine and fentanyl. According to Jennifer R., mother acknowledged using fentanyl next to Thomas while he napped, causing a fight with Bryan H., who was worried for Thomas. Jennifer R. also said that mother had found a methamphetamine pipe and was using it, and that Bryan H. "freaked out" and had to grab it because she had fallen asleep while it was out and Thomas was awake.

On November 21, while mother and Thomas were home with him, Bryan H. was arrested and tested positive for methamphetamine. Bryan H. later said that mother had given him the methamphetamine, and that same day mother had appeared to be under the influence of the drug while caring for Thomas. According to Jennifer R., mother said she had used drugs that

---

[1] On October 9, mother tested positive for methamphetamine. She tested positive for fentanyl on November 26, positive for fentanyl and cocaine on December 13, positive for fentanyl on December 17 and 19, positive for methamphetamine on January 3, and presumptively positive for fentanyl on January 3 and 10.

day. Probation called mother in the next day for testing, but she said she was unable to come.

A probation officer spoke with mother in December about the dangers of fentanyl for children, and he asked who took care of Thomas. Mother denied using around Thomas, and she replied that Mr. and Mrs. C. took care of him. The probation department referred mother to Napa County Alcohol and Drug Services (Alcohol and Drug Services), which scheduled an intake appointment, but mother did not show up. When the Alcohol and Drug Services later scheduled a full assessment, mother arrived an hour late, so the assessment was rescheduled.

## II.

## Referral and Investigation

On January 10, 2025, the Department received the referral based on the positive drug tests, and it opened its investigation. The reporting party said that mother denied use and said she did not know why she was testing positive.

When the Department spoke to mother, she denied use except for one instance of taking Norco in November and "one hit" of methamphetamine around New Year's. She denied fentanyl or cocaine use. She suggested that the positive test results were caused by either her mental health medication or the new cups probation used for drug tests. But mother's psychiatrist reported that nothing he prescribed for mother would create a false positive for cocaine or fentanyl.

A few days after Thanksgiving, mother says she took Thomas to maternal grandmother. Mother said that when she started receiving "false positives," she requested that maternal grandmother keep Thomas. Maternal grandmother believed mother's claims that she was clean, but

7

maternal grandmother also acknowledged that mother had informed her of a "slip" around Thanksgiving and had hinted at a relapse around New Year's.

When father learned about the drug tests on January 16, he was concerned. He said he had not known that mother was actively using and that he would seek custody of Thomas. The next day, he filed for emergency custody of Thomas in family court. The family court did not grant the request, but instead set a court date. Father acknowledged his prior DUIs and that he had used methamphetamine for about a month before older brother was born. Father had not sought treatment, and he did not have an official relapse prevention plan. He said that he currently drank one or two glasses of wine one or two nights a week and that he used marijuana in the evenings. Paternal grandmother said that father's recovery was going well and that she hadn't seen him drunk in the last year, though he still drank now and again. Mother said that father was an alcoholic and that paternal grandmother covered for him.

On January 21, mother reported working with Alcohol and Drug Services to get into La Casa Ujima (La Casa), a residential substance-abuse program where she could have Thomas. At first mother said that the program was her idea and that she really wanted to do it, but later that day she said she did not need such a high level of care and was "not excited" about going into treatment, though she knew it was a priority.

On January 24, mother checked into La Casa with Thomas at 3:30 p.m. But at 10 p.m. she called maternal grandmother, who came to get her and Thomas at 11 p.m. At La Casa, mother told the Department, she could not find her Subutex (a medication prescribed to help her with pain and opioid disorder), without which she felt sick. She also said that Thomas had a hard

time at the program. She told Mrs. C. that La Casa had put someone in her room who was detoxing, and that it was not safe for Thomas to be there.

The program coordinator at La Casa reported different facts. She said that the woman in mother's room had tested positive only for THC; was not detoxing; and was neither verbally aggressive nor threatening; that mother took her last dose of Subutex at about 8 p.m.; and that the program would have worked to get her prescription filled the next day. Staff reported that Thomas appeared to be having a good time and had already learned one staff member's name.

At 11 p.m. on January 25, mother went to the home of Jennifer R., who had not heard from mother since October. According to Jennifer R., mother said that she was desperate and out of medication, and she asked for money and for Jennifer R. to serve as her sponsor. It was at this time that mother told Jennifer R. that she had been struggling with methamphetamine and fentanyl, had used the day that Bryan H. had been arrested, had used fentanyl next to Thomas while he napped, and had fallen asleep with a methamphetamine pipe out while Thomas was awake.

Two days later, mother told the Department that she planned to attend her Alcohol and Drug Services assessment scheduled for February and then begin outpatient treatment. She said that La Casa had been "overkill" and that she had agreed to go because she thought that is what the Department wanted to hear.

The next day, on January 28, mother was arrested for a probation violation based on her positive drug tests. At court on February 4, mother admitted the violation and was sentenced to 90 days in jail subject to the probation department's discretion to release her into a drug treatment

9

program.  If she were diverted to such a program and left early, she would be re-arrested.

Up until her arrest, mother had continued to drug test with the probation department, and she had tested negative on January 15, 17, and 27.  Thomas was up to date on his well child examinations and vaccinations, and the Department had found him to be clean, appropriately dressed, and free of concerning marks or bruises.  The Department had found Bryan H.'s grandmother's house to be free of safety hazards and to have safe sleeping conditions, ample food, and working utilities.

After learning of mother's discharge from La Casa and arrest, father again filed for emergency custody.  The family court did not grant the request, instead maintaining the court date it had set.  On February 6, the Department held a Child and Family Team Meeting for father and his support network regarding his ability to care for Thomas.  Along with father, paternal grandmother, paternal uncle, and Mr. and Mrs. C. attended.  No one expressed concern about father's sobriety or his ability to care for Thomas.

## III.

### Protective Custody and Detention

#### A.

The same day as the team meeting, the Department applied for a protective custody warrant to temporarily remove Thomas from mother's custody.  The juvenile court granted the application that day, and Thomas was placed with father pending a detention hearing.

On February 10, the Department filed a juvenile dependency petition based on mother's substance abuse.  The Department also filed a detention report detailing its investigation.  The report included secondary sources recounting the dangers of fentanyl.  For example, quoting the St. Louis

Children's Hospital website, the report stated: "Fentanyl is an opioid that is prescribed as a pain reliever, but when a child accidentally ingests it (in its pill, powder or lozenge form) or is exposed to it (in its patch form), it slows and can eventually stop their breathing. The smallest adult dose is enough to kill a child."

The next day, the juvenile court held a detention hearing in which it found that the Department had made a prima facie showing that Thomas was subject to the court's jurisdiction, and that there was a factual basis for detaining Thomas from mother. The court set a jurisdictional and dispositional hearing, which was continued to May. Thomas remained with father.

**B.**

Between the detention hearing and the May jurisdictional and dispositional hearing, the Department continued to check on Thomas and to talk to father, mother, and other witnesses.

Father said that he worked from 7 a.m. to 3:30 p.m. Paternal grandmother took older brother to school and picked him up. Mr. and Mrs. C. cared for Thomas while father worked, and Mrs. C. also took Thomas to supervised visits with mother. Thomas referred to Mrs. and Mr. C. as "mom and dad." Father said that he was thankful that the C. family watched over Thomas.

On February 14, mother was released from jail to mandatory residential treatment, where she remained until April 24. The Department met with mother there three times.

Mother admitted that she had relapsed, but she denied that Thomas had ever been present. She also denied intentionally using fentanyl, suggesting that it had been laced, without her knowledge, into the

11

methamphetamine she used.  In her written Relapse Prevention Plan, she wrote that her drugs of choice were heroin, fentanyl, and methamphetamine.

Mother provided a lease showing that she would have housing for a year.  She said that she was scheduled to attend intensive outpatient treatment, had started meeting with a psychiatrist, was taking psychiatric medication and medication for drug cravings, and would soon start individual therapy sessions.  She maintained that father was violent and an alcoholic.

Mother visited Thomas at the Department twice a week.  Mother hugged and kissed him and told him she missed him.  The Department observed mother and Thomas laughing and appearing to have a good time.

The Department visited Thomas twice a month, either at father's house or at the C.'s house.  The Department observed that Thomas was doing well under father's care.  He smiled, held father's hand, and referred to father as "daddy."  He was active and used many words, including two-word phrases. Older brother read him books, shared snacks with him, and generally treated him gently.  Mrs. C. reported that Thomas continued to thrive in father's household, she believed Thomas was safe with father, father communicated often about pick up and drop off, and she had not seen father under the influence of any substances.

## IV.

### Jurisdictional and Dispositional Hearing

In May, the juvenile court held a two-day, contested jurisdictional and dispositional hearing.  The dependency petition alleged that there was a substantial risk that Thomas would suffer serious physical harm or illness because mother was unable to provide regular care due to her substance abuse.  As supporting facts, the petition alleged mother used fentanyl next to Thomas while he napped; Bryan H. observed mother to use fentanyl and

12

methamphetamine various other times while Thomas was home and under mother's care; mother had agreed to inpatient treatment at La Casa but discharged the same day she was admitted; mother had had a previous child removed from her care because she had used and exposed the child to heroin; and mother had failed to reunify with the child despite services.

The court acknowledged receiving and reviewing the Department's jurisdiction/disposition report filed on February 28 and an addendum filed on April 25. The court took judicial notice of the February 10 detention report and the case involving half sibling's removal. The court heard testimony from a Department social worker and from maternal grandmother.

After the close of evidence, the Department argued that it did not need to meet the clear and convincing standard of proof required for removal under Welfare and Institutions Code section 361, subdivision (c)(1).[2] Instead, the Department argued, the case fell under section 361.2 because father was willing to take custody of Thomas. According to the Department, mother bore the burden of showing by clear and convincing evidence that Thomas would be harmed if father were given custody. Mother argued that the court could not skip the removal decision.

In June, the juvenile court orally issued its ruling on the record, finding true by a preponderance of the evidence the Department's jurisdictional allegation. The court then stated that "[w]hen a court orders removal of a minor under Section 361, the Court must determine whether there is a [nonoffending and noncustodial] parent who wants to assume custody." If so, the court stated, the party opposing the placement must "show by clear and convincing evidence that the child will be harmed if the non-offending parent

_____

[2] All further statutory references are to the Welfare and Institutions Code.

13

is given custody." The court then found that "mother [had] fallen far short of her burden," and it concluded that it therefore must place Thomas with father.

The court did not address removal from mother on the record, and it did not otherwise make specific removal findings in a written order. But on the same day the court issued its oral rulings, it filed a form order titled "Findings and Orders After Jurisdictional Hearing" (some capitalization omitted), which included a form JV-420 attachment titled "Dispositional Attachment: Removal from Custodial Parent—Placement with Previously Noncustodial Parent (Welf. & Inst. Code, §§ 361, 361.2)" (some capitalization omitted). The JV-420 attachment stated that "[t]here is clear and convincing evidence of the circumstances stated in . . . § 361," specifying "[m]other" and "361(c)(1)," which authorizes removal when there would be a substantial danger to the child if they were returned home and there are no other reasonable means to protect the child. (§ 361, subd. (c)(1).) It also stated that "Reasonable efforts were made to prevent or eliminate the need for the child's removal from the home."

The court awarded sole legal and physical custody to father and dismissed the proceedings. It declined to maintain jurisdiction to supervise Thomas's placement with father.

## DISCUSSION

On appeal, Mother challenges the juvenile court's assertion of jurisdiction over Thomas, the adequacy of the court's removal decision and its dispositional orders removing Thomas from her custody, granting custody to father, and terminating jurisdiction rather than ordering supervision of Thomas's placement with father. We address each challenge in turn.

14

Mother first argues that the Department failed to establish that Thomas was within the juvenile court's jurisdiction.  We disagree.

Section 300 allows a juvenile court to exercise dependency jurisdiction over a child who has been abused, neglected, or is otherwise at risk of "serious physical harm or illness" because of a parent's abuse or inability to provide adequate care.  (§ 300, subds. (a)–(j).)  To establish jurisdiction based on a parent's substance abuse, the government must prove by a preponderance of the evidence that (1) the substance abuse (2) makes the parent unable to provide regular care to the child and (3) "this inability has caused the child to suffer serious physical harm or illness or creates a substantial risk of such harm or illness." (*In re N.R.* (2023) 15 Cal.5th 520, 558 [construing § 300, subd. (b)(1)(D)]; § 355, subd. (a) [setting forth preponderance of the evidence standard].)  The court must determine whether the elements exist at the time of the hearing.  (*In re L.W.* (2025) 109 Cal.App.5th 1012, 1017–1018.)

"We review a juvenile court's jurisdictional findings and conclusions for substantial evidence, examining the whole record in a light most favorable to the court's findings and conclusions."  (*In re L.G.* (2026) 118 Cal.App.5th 1208, 1225.)  Substantial evidence may include inferences that logically and reasonably relate to evidence in the record.  (*Ibid.*)  We do not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.  (*In re Travis C.* (2017) 13 Cal.App.5th 1219, 1225.)  A juvenile court's finding will stand " 'if it is supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.' " (*Ibid.*)

## A.

The first question under *In re N.R., supra,* 15 Cal.5th 558, is whether mother qualified as a substance abuser. "[S]ubstance abuse" means "excessive use of drugs or alcohol." (*Id.* at p. 555.) Excessive use can include when a person's substance use causes recurrent legal problems or results in a failure to fulfill major role obligations at work or at home. (*In re Drake M.* (2012) 211 Cal.App.4th 754, 766, disapproved on other grounds by *N.R.*, at pp. 550, 556–557 and *In re D.P.* (2023) 14 Cal.5th 266, 283 [discussing diagnostic criteria for substance abuse set forth in Am. Psychiatric Assn., Diagnostic & Statistical Manual of Mental Disorders (4th ed. 2000) p. 199 (DSM)]; see *N.R.*, at pp. 555–556 ["[E]vidence bearing upon whether DSM criteria have been met[ ] may be helpful in evaluating the existence of substance abuse . . . ."].)

Substantial evidence supported a finding that mother's substance use was excessive and thus could be deemed "substance abuse." In 2015, mother was arrested and convicted of cruelty to a child with possible injury or death relating to her heroin use; consequently, a court removed two-year-old half sibling from her care; and despite reunification services, mother failed to reunify with half sibling and lost parental rights. Father reported his belief that substance use caused mother to neglect older brother; mother violated probation while she still shared custody of older brother; father reported that mother smoked methamphetamine with older brother present and while she was pregnant with Thomas; while in late pregnancy with Thomas, mother was convicted of being under the influence of a controlled substance; she failed to show up to six consecutive visitations with older brother and left Thomas for weeks at a time with the C. family, both of which the court could infer related to substance use; she tested positive for fentanyl, cocaine, and

16

methamphetamine multiple times from October 2024 to January 2025; she resisted the probation department's efforts to connect her with services; she discharged the same day from voluntary residential treatment; and she was arrested for a probation violation based on the positive drug tests.

Mother argues that a substance-abuse finding was not supported at the time of the jurisdictional hearing because she had not had a positive drug test for four months and she had completed a residential treatment program. But a recent period of sobriety does not necessarily negate a longer-term history of substance abuse. (*In re H.B.* (2024) 106 Cal.App.5th 219, 242 [given father's history of substance abuse, "the juvenile court could reasonably find it highly probable that father's four or so months of sobriety did not mean he was no longer at risk of relapsing"]; *In re Cliffton B.* (2000) 81 Cal.App.4th 415, 423–424, superseded by statute on another ground as stated in *In re Andrew M.* (2024) 102 Cal.App.5th 803, 817–818 [denying parent's request for custody or further reunification services despite parent's seven months of recent sobriety in view of long substance-abuse history].) Here, mother had a decade of substance abuse dating back to her 2015 convictions. She had gone through residential treatment for several months when Thomas was born, but it did not prevent her relapse. In the context of this history, the Department social worker testified that she remained concerned about relapse. One reason was that while mother was in residential treatment, "she was in a setting where people were taking care of her. She wasn't stressed. Now she is out of treatment. She is in a real world situation. And that can be stressful sometimes." The juvenile court thus reasonably could find that mother's recent mandatory treatment and negative tests did not mean that she had progressed to a degree of stable sobriety precluding a finding of substance abuse.

17

## B.

The second question is whether substantial evidence supported the juvenile court's finding that mother's substance abuse made her unable to provide Thomas with regular care. We conclude that it did.

Bryan H. reported that he saw mother use drugs while Thomas was in her care a couple of times. He reported specifically that mother appeared to have used methamphetamine while she was caring for Thomas the day that Bryan H. was arrested. Mother missed her drug test the next day without explanation. According to Jennifer R., mother admitted using drugs while caring for Thomas on the day of Bryan H.'s arrest. In addition, mother told Jennifer R. that she had used fentanyl next to Thomas while he napped. From this evidence, the juvenile court reasonably could conclude that mother used drugs while Thomas was present, and it reasonably could infer that such use interfered with her ability to provide him with the regular care a two-year-old requires.

Mother's counterarguments do not persuade us otherwise. First, she contends that Bryan H.'s statements were not credible because he was a criminal methamphetamine user. While mother agrees that we may not evaluate the credibility of witnesses, she notes that the juvenile court did not make an express finding as to Bryan H.'s credibility. But she cites no authority supporting her implication that a reviewing court may disregard or discount testimony because the juvenile court made no express credibility finding. Moreover, she does not challenge Jennifer R.'s statements.

Next, mother argues that other evidence supports a finding that she did not use in Thomas's presence. She cites her own statements, which the juvenile court could have found not credible. And she cites statements from other people that mother dropped Thomas off with the C. family or maternal

18

grandmother, with the implication that mother used substances only when Thomas was not with her. But taken as true, these statements are not inconsistent with mother using substances in Thomas's presence at other times. In any event, it is not the role of this court to resolve evidentiary conflicts. (*In re Travis C., supra*, 13 Cal.App.5th at p. 1225.)

Alternatively, mother concedes that while "most of the time" she would hand Thomas off to maternal grandmother or the C. family before using, she did not do so every time. She argues that she nonetheless was able to provide regular care: Thomas had no marks or bruises, he appeared healthy, he was up to date on medical care, and he had food and safe sleeping conditions. But evidence from a single Department visit that Thomas received general care did not negate a reasonable inference by the juvenile court that mother could not provide regular care—which for a two-year-old would be constant and intensive—specifically while she was using methamphetamine, cocaine, or fentanyl.

## C.

The third question is whether substantial evidence supported a finding that mother's inability to provide regular care put Thomas at substantial risk of serious harm or illness. We conclude that it did.

The Supreme Court has explained that " '[s]ome risks may be substantial even if they carry a low degree of probability because the magnitude of the harm is potentially great.' " (*In re I.J.* (2013) 56 Cal.4th 766, 778.) "[T]he court must consider both the likelihood that harm will occur and the magnitude of potential harm . . . .' " (*Ibid.*)

In the present case, not only was there evidence that mother used drugs while Thomas was present, but also that she (1) had used fentanyl next to him while he napped and (2) had fallen asleep with a methamphetamine

19

pipe left out while he was awake. The record also contained information that exposure to a very small amount of fentanyl can stop a child's breathing, potentially leading to death. In other words, the magnitude of the potential harm was very great. As articulated by the juvenile court: "One relapse after a long period of sobriety can result in overdose and death of the parent, leaving the child without a caregiver. In addition, one relapse brings into a home highly dangerous and potent substances where a curious and energetic two-year-old could discover and ingest [them]."

Moreover, mother initially denied all drug use (while also suggesting that she would hand off Thomas if she used). She later admitted only to taking a Norco and one hit of methamphetamine. Then while in residential treatment she admitted that she had relapsed on illegal substances, but she still continued to deny intentional fentanyl use, in direct contradiction to Bryan H.'s and Jennifer R.'s statements. Likewise, mother consistently denied that she had used in Thomas's presence, again, despite statements to the contrary from Bryan H. and Jennifer R. From mother's denials, the juvenile court reasonably could infer that avoiding detection was more important to mother than addressing her substance abuse in order to keep Thomas safe. (See *In re E.E.* (2020) 49 Cal.App.5th 195, 213.) The court could further infer that it was more likely that mother would again relapse and deny having done so. (*In re A.F.* (2016) 3 Cal.App.5th 283, 293 [" '[D]enial is a factor often relevant to determining whether persons are likely to modify their behavior in the future without court supervision' "].)

The cases mother cites are distinguishable because none involved evidence that a parent with a long history of substance abuse had used fentanyl and methamphetamine while caring for a two-year-old. *In re Gilberto G.* (2024) 105 Cal.App.5th 52 concerned a single instance of the

20

mother riding a public bus with her children while under the influence of marijuana and alcohol. (*Id.* at pp. 63, 66–67.) *In re L.C.* (2019) 38 Cal.App.5th 646, disapproved in *In re N.R., supra*, 15 Cal.5th at p. 560 fn. 18, involved a six-year-old's guardian who infrequently used methamphetamine recreationally outside the home. (*L.C.,* at pp. 648, 650.) *In re Rebecca C.* (2014) 228 Cal.App.4th 720 and *In re Destiny S.* (2021) 210 Cal.App.4th 999 involved a 13 year old and an 11 year old, respectively, with mothers who used methamphetamine. (*Rebecca C.*, at p. 727; *Destiny S.*, at p. 1001.) As the *Destiny S.* court noted, an 11 year old " 'was old enough to avoid the kinds of physical dangers which make infancy an inherently hazardous period of life.' " (*Destiny S.*, at p. 1004, quoting *In re Rocco M.* (1991) 1 Cal.App.4th 814, 825, abrogated on another ground by *In re R.T.* (2017) 3 Cal.5th 622, 627–628.)

## II.

Once a juvenile court asserts jurisdiction, the court must determine the proper disposition of the child. (§ 361, subd. (a).) Under section 361, subdivisions (c)(1) or (d),[3] a child may be removed from the custody of a parent if the juvenile court finds clear and convincing evidence that (1) there would be substantial danger to the child's safety or physical well-being if the child were returned to the parent and (2) there are no reasonable means by which the child can be protected short of removing the child. (§ 361, subds. (c)(1) & (d).) If the court decides that removal is warranted, it must state the facts upon which that decision is based. (§ 361, subd. (e).)

---

[3] Subdivision (c)(1), addresses removal when a child resides with the parent at the time the petition was filed, while subdivision (d) addresses removal when a child does not. (§ 361, subds. (c) & (d).)

At the jurisdictional and depositional hearing, the Department incorrectly argued that the juvenile court could skip making a removal determination because father—a nonoffending parent who did not have custody of Thomas at the time of the dependency petition—was willing to assume custody. On appeal, the Department does not dispute that, in fact, the court must first determine that removal from the custodial parent is supported by clear and convincing evidence. (See § 361, subds. (c)(1) & (d).) Only then may the court place the child elsewhere, including with a noncustodial parent. (See *ibid.*; § 361.2.)

We are not persuaded that the juvenile court failed to make a removal decision, as mother contends. It is true that the court did not discuss removal at the hearing, instead setting forth the standards for, and discussing, only jurisdiction and placement with a noncustodial parent. But the court filed a form titled "Dispositional Attachment: Removal from Custodial Parent— Placement with Previously Noncustodial Parent (Welf. & Inst. Code, §§ 361, 361.2)." (Some capitalization omitted.) The form expressly stated "[t]here is clear and convincing evidence of the circumstances stated in . . . § 361" and in filling out the form, the court specified "[m]other" and "361(c)(1)" by checking boxes. Section 361, subdivision (c)(1) states, "[t]here . . . would be a substantial danger to the [child's] physical health, safety, protection, or physical or emotional well-being . . . if the [child] were returned home . . . ." The filed form thus documented the court's decision that removal was warranted under the proper evidentiary standard.

Mother cites *In re Maribel T.* (2002) 96 Cal.App.4th 82, 86, for the proposition that the hearing transcript should control over the filed form if it shows that the court did not orally make a removal determination. But the case is distinguishable. There, the juvenile court said at a hearing that the

22

father could not remove Maribel T. from the state without first *notifying* the mother. (*Id.* at p. 84.) A subsequent written order directly contradicted the transcript, providing one parent could not remove Maribel T. from the state without the other parent's *written consent*. (*Ibid.*) On appeal both parents agreed that the court should modify the written order to conform to the oral pronouncement, and the government took no position in the matter. (*Id.* at p. 85 & fn. 3.) Here, there is no direct conflict between the transcript, which is silent as to removal, and the filed form, which specifies that removal is warranted. For the present case to be analogous to *Maribel T.*, the transcript would have to state that removal was improper or that there was no need to make a removal decision. Moreover, the parties in this case do not agree about what the omission in the transcript means.

We agree with mother, however, that section 361, subdivision (e), required the juvenile court to state the facts on which it based its removal decision. The filed form did not state such facts, and the court did not expressly set forth removal facts or a removal analysis elsewhere. The omission was error. (See *In re L.O.* (2021) 67 Cal.App.5th 227, 247; *In re D.P.* (2020) 44 Cal.App.5th 1058, 1067.)

The question that follows is whether the omission prejudiced mother, as she contends. A juvenile court's failure to state removal facts is harmless when it is not reasonably probable that the recitation would have led the court to uphold the parent's continued custody. (*In re L.O., supra,* 67 Cal.App.5th at 247.) "Reasonably probable" means a reasonable chance that is more than an abstract possibility. (*In re D.P., supra,* 44 Cal.App.5th at p. 1068.) A related question raised by mother is whether substantial evidence supports the court's removal decision, taking into account the clear and convincing standard. (See *Conservatorship of O.B.* (2020) 9 Cal.5th 989,

995–996 [reviewing court must take account of standard of decision applied by trial court].)  Based on our review of the record, we conclude that (1) it is not reasonably probable that the juvenile court would have found that Thomas could safely be returned home had the court stated facts in support of its decision and (2) substantial evidence supports the court's removal order.

While the juvenile court did not expressly connect its statements to removal, it explained its findings and conclusions about the danger Thomas faced during its jurisdictional analysis.  The court noted mother's "history of substance abuse involving dangerous and highly addicted substances, fentanyl, methamphetamine, and heroin."  It further noted that a relapse could result in "death of the parent, leaving the child without a caregiver" or in "highly dangerous and potent substances" in the house that "a curious and energetic two-year-old could discover" and ingest.  Based on the court's statements regarding the risk of serious physical harm, and its filing of the form JV 420 regarding removal, we do not think it is reasonably probable that it would have returned Thomas to mother's care if it had complied with section 361, subdivision (e).

In addition, "the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable" that there would be substantial danger to Thomas's safety or physical well-being if he were returned to mother.[4] (*Conservatorship of O.B., supra*, 9 Cal.5th at pp. 995–996 [discussing reviewing court's analytical framework when standard of decision was clear and convincing evidence].)  As noted above, the record contains evidence that mother had a long history of substance abuse,

---

[4] Mother makes no argument about whether there were reasonable means to protect Thomas other than removal.  Accordingly, we address the sufficiency of the evidence only as it relates to whether Thomas faced substantial danger.

used methamphetamine and fentanyl in Thomas's presence, and repeatedly denied the full extent of her actions.

## III.

Mother next argues that the juvenile court erred by granting father custody because clear and convincing evidence supported a finding that the placement would be detrimental to Thomas. We disagree.

Once a juvenile court removes a child from a custodial parent, the court "shall first determine whether there is a parent . . . with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child." (§ 361.2, subd. (a).) If such a parent requests custody, "the court shall place the child with the parent unless it finds that [the] placement . . . would be detrimental to the safety, protection, or physical or emotional well-being of the child." (*Ibid.*) The party opposing the placement—in this case, mother—has the burden to show by clear and convincing evidence that the placement would harm the child. (*In re C.M.* (2014) 232 Cal.App.4th 1394, 1400–1402.)

When we review a juvenile court's findings in dependency cases, we typically assess whether substantial evidence supports the findings, because usually the party appealing is a parent or guardian who contends that the government did not carry its burden of proof. But the posture is different when, as in this instance, the juvenile court has "concluded that the party with the burden of proof did not carry the burden and *that party* appeals." (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved on other ground by *Conservatorship of O.B., supra*, 9 Cal.5th at p. 1010, fn. 7.) (Italics added.) Then "it is misleading to characterize the . . . issue as whether substantial evidence supports the judgment." (*I.W.*, at p. 1528.) Instead, "the question

for the reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law." (*Ibid.*)  In such a case, " 'it is almost impossible for [the party who had the burden of proof] to prevail on appeal by arguing [that] the evidence compels a judgment in his favor.' " (*Atkins v. City of Los Angeles* (2017) 8 Cal.App.5th 696, 734.)

For mother to prevail, her evidence of detriment would need to be "(1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding' " in mother's favor.  (*In re I.W., supra*, 180 Cal.App.4th at p. 1528.)  But evidence showed that father tried to protect Thomas by seeking custody when he learned about mother's positive drug tests; Thomas was attached to father and was thriving in father's care; father could meet Thomas's needs; father was not abusing substances; and older brother had thrived under father's care.  Because this evidence contradicted mother's position, we decline her invitation to revisit the contrary evidence she cites. (See *ibid.*)

## IV.

Lastly, mother argues that the juvenile court erred by not maintaining jurisdiction of Thomas to ensure that father was sober and Thomas was safe. We disagree.

If the juvenile court places a child with a formerly noncustodial parent under section 361.2, subdivision (a), then the court has three options.  First, it may "[o]rder that the parent become legal and physical custodian of the child" and terminate its jurisdiction over the child, as the court did here. (§ 361.2, subd. (b)(1).)  Second, it may "[o]rder that the parent assume custody subject to the jurisdiction of the juvenile court and require that a home visit be conducted within three months."  (§ 361, subd. (b)(2).)  Third, it

26

may "[o]rder that the parent assume custody subject to the supervision of the juvenile court." (§ 361.2, subd. (b)(3).) We review an order awarding custody and terminating jurisdiction under section 361.2 for abuse of discretion. (See *In re Nada R.* (2001) 89 Cal.App.4th 1166, 1179). The juvenile court abuses its discretion when it "exceed[s] the bounds of reason." (*In re Jaden E.* (2014) 229 Cal.App.4th 1277, 1288.) " 'When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' " (*Ibid.*)

We see no abuse of discretion here. Evidence showed that the Department had been visiting Thomas twice a month at father's house and at the C. family's house from the time Thomas was detained until it filed its addendum report before the jurisdictional and depositional hearing. The Department observed that Thomas was doing well, and that "father [was] able and willing to safely care for Thomas and [had met] all of Thomas' needs." In addition, Mrs. C. reported that she had not seen any indication that father was using substances. The Department and Thomas J.'s counsel both recommended that the court grant father custody and terminate jurisdiction. Based on these circumstances, the juvenile court reasonably could conclude that Thomas was safe in father's care without the Department's supervision.

## DISPOSITION

The orders appealed from are affirmed.

GOLDMAN, J.

WE CONCUR:

BROWN, P. J.
SWEET, J. *

---

*Judge of the Marin Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.